I iGREMILLION, Judge.
Francis Lewis appeals the trial court’s judgment in favor of the defendants, Arthur Kahn and the City of Jeanerette. The trial court dismissed Mrs. Lewis’ claims against the two defendants, finding that Kahn, the former Jeanerette Chief of Police, acted reasonably in using deadly force to disarm Eddie Lewis, Mrs. Lewis’ son. After reviewing the record in its entirety, we find no error and affirm the judgment of the trial court.
FACTS
On July 14, 1993, Gordon Smith, a Kent-wood Spring Water employee, was making a water delivery to the Ronald Hebert home located at the intersection of Hubertville and Forty Arpent Roads, just outside the Jeaner-ette city limits. As [gSmith was making the delivery, Eddie Lewis began to approach him, motioning to him. Smith, unable to understand Lewis, began to walk towards *779 him. Lewis then motioned to a large knife he was carrying and asked, “You want some of this?” Smith began to back away, but Lewis attacked him, hitting him in the stomach with the flat of the knife. Lewis continued to press Smith, threatening him with the knife as Smith retreated.
Glenn Verret was passing in front of the Hebert home on his way to work when he saw the attack on Smith. Verret stopped his vehicle at the edge of the Hebert’s driveway and told Smith to get in. Once Smith was safe in the vehicle, Verret called 911 on his cellular phone and reported the incident. During the time they waited for the police to arrive, Smith and Verret watched as Lewis stopped several vehicles and accosted them with his knife. Lewis would waive the knife at the occupants of a car and then approach the driver’s side of the vehicle and strike the window with the knife gesturing for the driver to open the window.
After accosting the passengers of several vehicles and unsuccessfully making them open their windows, Lewis began walking east on Forty Arpent Road. At this point, Lieutenant Alfred Evans of the City of Jean-erette arrived on the scene. The New Iberia Police Department received the 911 call and transferred it to the Iberia Parish Sheriffs Office. The sheriffs office, thinking the incident occurred in the City of Jeanerette transferred the call to the city; hence, Evans was dispatched to answer the call.
Smith and Verret were still on the scene when Evans arrived. They pointed Lewis out to Evans. At the time, Lewis was about fifty to sixty yards down the road. Evans proceeded in his vehicle until he was just behind Lewis. He then left his police cruiser and began to approach Lewis from the rear. Evans recognized [3Lewis from having previously arrested him and he noticed the knife in Lewis’ pocket. When Evans called out to him, Lewis turned and drew the knife. Evans drew his gun and ordered Lewis to drop the knife. Lewis responded unintelligibly, refused to drop the knife, and turned and began to walk away. Evans followed him at about ten feet, ordering him to drop the knife to no avail.
Chief Kahn arrived at the scene shortly after Evans. He drove his unmarked car close to the two men and parked it at a forty-five degree angle across the road. Noticing Lewis waving the knife, Kahn immediately called the sheriffs office for a back-up. Kahn left his car and walked to its rear, where he took up a position fifteen to twenty feet in front of Lewis. He recognized Lewis, who was waving his knife around erratically and speaking incoherently. Kahn drew his own gun and commanded Lewis to drop his knife and lie on the ground. Lewis did not comply, instead he bent down and patted the surface of the roadway, and told them that the road was his property and ordered them to get off of it. Lewis said that he had done nothing wrong and they had no right to “mess with him.”
Kahn and Evans continued giving orders to Lewis, but instead of complying, he turned to Kahn and took a step towards him. Kahn fired a warning shot into a ditch off to Lewis’ left and told him that the shot was a warning and if he came any closer, he would shoot him. Lewis stopped and told Kahn to go ahead and shoot him, that he did not care. Lewis again informed the officers that the road was his property and they were to get off of it and leave him alone. Kahn and Lewis continued ordering him to drop the knife and lie on the ground, but Lewis turned towards Kahn and began walking towards him again, waving the knife overhead. Kahn ordered him several times to stop and drop the knife. When Lewis was within a few feet of Kahn, he moved the knife in a stabbing motion and Kahn backed | towards his car, and fired his gun. The bullet struck Lewis in the abdomen, causing his demise.
On July 26, 1993, Mrs. Lewis filed suit against Kahn and the City of Jeanerette, seeking wrongful death and survival action damages. Her petition alleged that Kahn knew Lewis suffered from a mental illness, that he was a wood carver and carried a carving knife, that he did not pose a threat to Kahn, and that he could have been subdued without the use of deadly force. Mrs. Lewis’ petition further alleged that the City of Jean-erette was liable under the doctrine of re-spondeat superior and because it knew or *780 should have known that Kahn had a history of using excessive force.
A trial on the merits was held on April 12 and 17, 1995. Along with Kahn and Evans, five other eyewitnesses to the shooting testified; Verret, Robert Hebert, Sr., Terry Me-kash, Elvis Derise, and Robert John Lewis (no relation to Lewis). The testimony of these witnesses was basically consistent. They all saw Lewis holding the knife and walking towards Kahn when the second shot was fired. Hebert and Mekash testified that Lewis was within eight feet of Kahn when the shot was fired. Derise and Robert John Lewis testified that Lewis was within ten feet of Kahn at that time. Robert John Lewis, Mrs. Lewis’ own witness, testified that Lewis was acting abnormally.
After hearing the testimony and taking the matter under advisement, the trial court issued written reasons for judgment finding that Kahn was not liable to Mrs. Lewis because he did not breach the duty he owed Lewis. A judgment was rendered by the trial court on July 17, 1995, dismissing with prejudice the claims against both Kahn and the City of Jeanerette. Mrs. Lewis appeals, arguing that the trial court erred by not rendering judgment in her favor. She alleges that the ^statement by Kahn, that Lewis made a stabbing motion towards him was inconsistent with the testimony of all other eyewitnesses. Mrs. Lewis argues that under the standards set out in Mathieu v. Imperial Toy Corp., 94-952 (La. 11/30/94), 646 So.2d 318, Kahn’s actions were an unreasonable use of excessive force.
LAW
The role of the appellate court has been examined in numerous eases. In Rosell v. ESCO, 549 So.2d 840 (La.1989), the court stated that a trial court’s finding of fact may not be set aside in the absence of manifest error or unless it is clearly wrong. If the trial court is confronted with conflicting testimony, then its reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review. Id. The appellate court, instead of trying to determine whether the trial court was right or wrong, reviews the entire record to see if the trial court’s finding was reasonable. Stobart v. State Through DOTD, 617 So.2d 880 (La.1993).
Liability for negligence is assessed under La.Civ.Code art. 2315 through application of a duty/risk analysis. In Mathieu, 646 So.2d at 322, the court stated:
[I]n order for liability to attach under a duty/risk analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard (the breach of duty element); (3) the defendant’s substandard conduct was a cause-in-fact of the plaintiffs injuries (the cause-in-fact element); (4) the defendant’s substandard conduct was a legal cause of the plaintiffs injuries (the scope of liability or scope of protection element); and, (5) actual damages (the damages element).
In Kyle v. City of New Orleans, 353 So.2d 969 (La.1977), the Louisiana Supreme Court held that the use of force by police officers, when making an arrest, is a legitimate police function. However, the amount of force which may be used must be limited to that required under the totality of the circumstances. In determining whether the force used by an officer was reasonable, a trial court leevaluates the officer’s actions against those of an ordinary, prudent, and reasonable officer, placed in the same position and possessing the same knowledge as the officer at issue. Id. Seven factors were enunciated in Kyle to aid a trial court in determining the reasonableness of an officer’s actions:
... the known character of the arrestee, the risks and dangers faced by the officers, the nature of the offense involved, the chance of the arrestee’s escape if the particular means are not employed, the existence of alternative methods of arrest, the physical size, strength, and weaponry of the officers as compared to the arrestee, and the exigencies of the moment.
Id. at 973.
In Mathieu, 646 So.2d 318, the court held that the duty of reasonableness which applies in a Kyle situation, where an officer is mak *781 ing an arrest, should also apply when an officer is approaching a suspect with the intention of disarming him. The court stated:
Given the similar nature of the character of the police officer’s actions in a Kyle situation and in a situation where, as here, an officer is required to approach and instigate contact with a suspect in order to further his or her investigation, we hold that the duty owed by the officers in this case in approaching Mr. Mathieu while attempting to disarm him is one of reasonableness under the totality of the circumstances, and that the reasonableness of the officers’ actions should be determined through consideration of the factors enunciated in Kyle, (emphasis theirs)
Id. at 823.
In discussing what would be considered reasonable, the court further stated:
... the scope of an officer’s duty to act reasonably under the circumstances does not extend so far as to require that the officer always choose the “best,” or even a “better” method of approach. See Scott v. Henrich, 39 F.3d 912 (9th Cir. (Mont.) 1994). As the Scott court noted, officers confronted with a situation which requires them to approach and instigate contact with a suspect are only required to choose a course of action within that range identified as “reasonable.”
Id. at 325.
|7The first inquiry under the duty/risk analysis concerns the duty element. Did Kahn owe a duty to Lewis? Both Kahn and Evans received reports that a black male, wearing a white hat and shirt, had accosted a Kentwood driver with a knife in the area of the Ronald Hebert farm. Kahn testified that he felt justified in arresting the suspect because the crime committed, aggravated battery, was a felony. Even though the initial incident occurred outside the Jeanerette city limits, Evans and Kahn still had authority to effectuate the arrest. The Jeanerette Police Department was contacted by the Sheriffs Department, who commonly called them for assistance on calls located just outside the city limits, since their response time to those calls was quicker. Since Kahn had authority to approach and disarm Lewis, the duty he owed Lewis was one of reasonableness under the totality of the circumstances.
In addressing the second element in the duty/risk analysis, we adopt the well reasoned findings of the learned trial judge, stated in her written reasons for judgment:
The next duty/risk inquiry is whether the duty owed by Chief Kahn to Lewis was breached by the method employed. In order to determine if the use of deadly force was reasonable under the totality of the circumstances, the court will employ the Kyle factors.
The first Kyle factor is the known character of the subject. Prior to arriving on the scene, Chief Kahn listened to the police radio and learned that the subject was armed with a butcher knife, had assaulted a Kentwood Water delivery man, and was acting in a bizarre and incoherent manner. Chief Kahn testified that as soon as he arrived on the scene he recognized Lewis. Chief Kahn was well aware of his history of violence and of mental problems; Chief Kahn had picked him up on several occasions under protective custody orders.
The second Kyle factor is the risk and danger faced by the officer. Both the officers and innocent bystanders were faced with the threat of immediate physical harm. Lt. Evans stated that he continued to keep his gun drawn as he feared for his safety and the safety of others. All the witnesses who actually saw the shooting testified that Lewis had his knife pointing out, making jabbing motions toward Chief Kahn, and that he came within eight to four feet of Chief Kahn. Clearly, Lewis’ actions posed a threat of serious injury and danger to Chief Kahn and Rpossibly to bystanders.
The third Kyle factor is the nature of the offense involved. The officers were responding to a complaint of an armed individual who had already assaulted someone. They were aware that Lewis had advanced on and threatened drivers near Hubertville Road. Based on this knowledge and his observations, Chief Kahn had every reason to believe that the offense *782 involved was serious and potentially life-threatening.
The fourth Kyle factor is the chance of the subject’s escape if the particular means are not employed. Lt. Evans and Chief Kahn both testified that they feared that Lewis would not obey their commands to drop the knife and would escape to a nearby house, possibly take a hostage or escape through the sugarcane in the field adjacent to the road. Additionally, given the fact that Lewis repeatedly ignored their warnings to stop moving and drop the knife, it was reasonable for Chief Kahn to believe that Lewis might escape.
The fifth Kyle factor is the existence of alternative methods. Unfortunately, when the facts are viewed closely, they become difficult to imagine. The testimony at trial demonstrated that Lewis was only feet from Chief Kahn with a large butcher knife thrusting directly at him. The fact that this knife may also have been used for wood carving does not mean that it could not be used to harm. Lewis was acting in an irrational and incoherent manner, which behavior increased the public threat. Lt. Evans testified that when an aggressor comes within your ten-foot circle of danger, it is standard police practice to shoot to the middle of the aggressor’s body to protect your own life. Police officers are not taught to shoot an arm or a leg or a foot because an armed suspect who is that close to an officer could still pose a significant threat. Lewis approached using jabbing motions with the knife. The choice became retreat or shoot.
The sixth Kyle factor is the physical size, strength and weaponry of the officer as compared to the suspect. Initially the suspect was outnumbered two to one. However, once Lewis advanced on Chief Kahn at the tail end of his car, the situation became a one-on-one confrontation. While Chief Kahn may have had some tactical advantage in that he was armed with a gun, he was also faced with an irrational man with a history of violence who was brandishing a large knife just feet away. Unless he retreated behind his car, Chief Kahn was faced with the risk of a fatal stabbing to himself.
The seventh and final Kyle factor is the exigency of the moment. The incident took place during the day in a relatively busy residential and farming area with workers and residents standing along the streets observing the incident. Lt. Evans and Chief Kahn testified that they believed Lewis to be a violent man. They believed that they needed to disarm Lewis immediately before he escaped though the |9adjacent sugarcane field or the neighboring residential area where the safety of the public would be put in danger. Considering these circumstances, it was reasonable for Chief Kahn to believe that it was necessary to disarm Lewis immediately.
By cross examination and by closing statement, the defendant advances arguments to the contrary. The plaintiff argues that racial animus motivated Chief Kahn and distorted the testimony of the witnesses. However, the testimony of Lt. Evans, a black officer, is entirely consistent with that of Chief Kahn, who is white. And John Lewis (Robert John Lewis), the black witness, is consistent with the other witnesses, who are white, in the critical observations; namely, that Lewis advanced upon Chief Kahn (not the contrary); that Lewis had a history of violence and this day acted irrationally; that Lewis brandished a knife within the area which is, in police terms, the circle of danger. General testimony about racial tensions in the City of Jeanerette is not material to the issue at hand, determination of liability based upon analysis of the conduct of the parties.
Courts have continuously held that an officer’s duty to act reasonably does not extend so far as to require that the officer always choose the “best” or even a “better” method of approach. Scott v. Henrich, 39 F.3d 912 (9th Cir.1994). The only witnesses with expertise in police practice, Chief Kahn and Lt. Evans, both testified that the use of deadly force under these circumstances is the accepted and proper method. Lt. Evans emphatically testified that he would have done the same thing as Chief Kahn, had he been in the same situation. It is accepted (sic) practice of police *783 to shoot to the middle of the aggressor; it is actually not recommended and bad police practice to shoot for an arm or a foot since the aggressor may still be able to lunge at you with the knife. Plaintiff presented no expert testimony regarding any other accepted method. The court finds that there is no evidence of a “better” police practice, let alone that the one employed was not reasonable under the totality of the circumstances.
A negative answer to any of the inquiries of the duty/risk analysis results in a determination of no liability. Mathieu, supra. Therefore, as the court has determined that Chief Kahn did not breach his duty to Eddie Lewis, there can be no finding of liability in this case. The remaining question in the duty/risk analysis need not be considered.
After reviewing the record, we find that the trial court’s holding, with regards to the liability of Kahn, was proper and correct.
CONCLUSION
For the reasons assigned, the judgment of the trial court is affirmed. Costs of this appeal are assessed to the plaintiff-appellant, Francis Lewis.
AFFIRMED.
COOKS, J., dissents.